UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
DEMEZZ HAMILTON,                              :
                                              :
                Plaintiff,       :       22-CV-6917 (PGG) (OTW)
                                              :
                -against-        :       **OPINION & ORDER**
                                              :
UBER TECHNOLOGIES, INC.,                      :
                                              :
                Defendant.       :
------------------------------------------------------------x

        **ONA T. WANG**, **United States Magistrate Judge**:

I.      **INTRODUCTION**

        *Pro se* Plaintiff Demezz Hamilton ("Mr. Hamilton") filed this suit in August 2022, alleging that he was discriminated against based on his race when attempting to use Defendant Uber Technologies, Inc.'s ("Uber") services for transportation to a medical appointment. (*See* ECF 2). Before the Court is Uber's motion to compel Mr. Hamilton's claims to arbitration and dismiss this action. (*See* ECF Nos. 27, 39). Courts in this Circuit have treated motions to dismiss an action pending arbitration as motions to stay the litigation.[1] Accordingly, the Court will treat Uber's request as a motion for a stay pending arbitration.[2] For the reasons set forth below,

---

[1] *See, e.g.*, *Yost v. Everyrealm, Inc.*, No. 22-CV-6549 (PAE), 2023 WL 2859160, at *11 (S.D.N.Y. Apr. 10, 2023) ("[A] stay, as opposed to a dismissal 'is consistent with the FAA's underlying policy to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible. A stay enables parties to proceed to arbitration directly, unencumbered by the uncertainty and expense of additional litigation, and generally precludes judicial interference until there is a final award.'") (quoting *Katz v. Cellco P'ship*, 794 F.3d 341, 346 (2d Cir. 2015)).

[2] A ruling on a motion to stay litigation pending arbitration is a non-case-dispositive motion properly before me under the Honorable Paul G. Gardephe's general pretrial supervision referral under 28 U.S.C. § 636(b)(1). *See, e.g.*, *Kumaran v. Vision Fin. Markets, LLC*, 20-CV-3871 (GHW), 2022 WL 17540669, at *2 (S.D.N.Y. Dec. 6, 2022) ("'District courts in this Circuit regularly have concluded that a motion to compel arbitration and stay litigation pending arbitration is non-dispositive . . . .'") (quoting *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 227 n.1 (S.D.N.Y. 2020) (collecting cases), *objections overruled*, 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021)).

Uber's motion to compel this case to arbitration is **GRANTED**. This case is hereby **STAYED in its entirety pending the outcome of arbitration**.

II. BACKGROUND

Mr. Hamilton, a Black man, alleges that on July 26, 2022, at 7:05 a.m., he ordered an Uber ride to his Manhattan apartment building (ECF 2 at ¶¶ 11-12), through a friend who requested the ride on Mr. Hamilton's behalf (ECF 27 at Ex. D "My car service provider (Standard Luxury) booked the ride for me using his Uber Account."). Uber identified the user as Idowu Daramola ("Mr. Daramola"). (ECF 27-1 at 7). As Mr. Hamilton crossed the street towards the waiting Uber, the driver rolled down his window and waved his hands "nonverbally indicating . . . that he was refusing transportation service to Plaintiff," called Mr. Hamilton a "N-----," and "abruptly made a U-turn." (ECF 2 at ¶ 13). Mr. Hamilton alleges that he photographed the license plate and that another eyewitness saw the incident. (*Id.* at ¶ 14). As a result of the incident, he was late to his dialysis appointment and "his treatment was shortened." (*Id.* at ¶ 15). He complained the same day to Uber and the New York City Taxi & Limousine Commission. (*Id.* at ¶ 16). On July 28, 2022, an Uber customer service representative responded to his complaint, and the following day, he received an email for $15 in "Uber cash" and a refund for the cancellation fee from the trip. (*Id.* at ¶¶ 17-18; *see also* ECF 27-7, Ex. D). Uber also indicated that it had "reminded" the driver of Uber's antidiscrimination policy. (*Id.* at ¶ 18).

Mr. Hamilton filed suit on August 15, 2022, claiming violations of 42 U.S.C. § 1981 and intentional infliction of emotional distress under state law. (ECF 2 at ¶¶ 20-25). On December 16, 2022, Uber moved to compel this case to arbitration. (ECF 27). The motion was fully briefed on January 17, 2023. (*See* ECF Nos. 13, 18, 21, 22, 27, 30, 39, and 40).

Uber asserts that Mr. Hamilton is bound to arbitrate his claims pursuant to a binding arbitration agreement in Uber's Terms of Use. (ECF 27-1 at 7). Uber offers a software application for smartphone users, the "Uber Rider App," through which users can call a vehicle when in need of transportation services. (ECF 27-1 at 8). To use this app, individuals must first download the Uber Rider App and create an Uber Rider account. (*Id.*) As part of the account creation process, users must agree to Uber's Terms of Use, which Uber occasionally updates or amends. (*Id.*) Users must agree to the updated or amended terms to continue using the Uber Rider App. (*Id.*) On the date of the incident, Mr. Daramola called a ride for Mr. Hamilton using Mr. Daramola's active Uber Rider account. (*Id.*) Based on Uber's records,[3] Mr. Daramola expressly agreed to Uber's December 2021 Terms of Use,[4] which contain a lengthy arbitration provision with the bolded heading "Arbitration Agreement." (ECF 27-11, Ex. G at Section 2). This agreement begins: "By agreeing to the Terms, you agree that you are required to resolve any claim that you may have against Uber on an individual basis in arbitration as set forth in this Arbitration Agreement . . ." (*Id.*) Section 2(a)(5) of this provision applies this agreement to potential third party claims:

> **Application to Third Parties:** This Arbitration Agreement shall be binding upon, and shall include any claims brought by or against any third parties, including but not limited to your spouses, heirs, **third-party beneficiaries** and assigns, where

---

[3] "In the normal course of its business, Uber maintains records regarding when and how Riders register and the Terms of Use . . . in effect and as amended from time to time, as well as trip request and trip history, and customer support conversations and exchanges with its users. Likewise, Uber maintains records regarding when Riders and Drivers affirmatively agree to the amended Terms, which is a requirement to maintain access to the respective Uber Apps." (ECF 27-4 at ¶ 5, Declaration of Chiarra Davis).

[4] When Uber updated its Terms of Service in December 2021, Uber riders were required to check an "I agree" box and click "Confirm" in order to continue past an in-app pop-up screen that included hyperlinks to the updated terms. (ECF 27-1 at 9). Next to the "I agree" checkbox was the following statement: "By checking the box, I have reviewed and agreed to the Terms of Use and acknowledge the Privacy Policy." (*Id.*) According to Uber's records, Mr. Daramola checked both the "I agree" checkbox and "Confirm" button on April 1, 2022, thereby assenting to the December 2021 Terms of Use. (*Id.*)

> their underlying claims arise out of or relate to your use of the Services. To the
> extent that any third-party beneficiary to this agreement brings claims against
> the Parties, those claims shall also be subject to this Arbitration Agreement.

(*Id.*) (emphasis added). This was the arbitration agreement in effect at the time Mr. Daramola called a ride for Mr. Hamilton on July 26, 2022.

Separately, Mr. Hamilton had created his own Uber account in 2017, which he used in 2018 and 2021 to request rides. (ECF Nos. 27-4 at 6 and 27-5, Ex. A). Mr. Hamilton states that Uber "permanently suspended" his account in October 2021 following "an altercation between the Plaintiff's brother and an Uber driver." (ECF 21 at 2). Mr. Hamilton further states he "has been using [Uber's] services both before and after that incident hundreds of times as a 'guest rider' to his dialysis appointments." (*Id.*) Mr. Hamilton alleges that he did not know any arbitration agreement existed and therefore cannot be bound by any such agreement whether related to his own or Mr. Daramola's Uber Rider account. (ECF Nos. 18 at 2, 21 at 2).

### III. DISCUSSION

#### 1. *Legal Standard*

Section 2 of the Federal Arbitration Act ("FAA") provides that a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has directed courts to "rigorously enforce arbitration agreements according to their terms." *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013) (citation and internal quotation marks omitted). Section 3 of the FAA further provides that if any suit is brought in federal court "upon any issue referable to arbitration," the court, "upon being satisfied" that an issue involved in

the suit is referable to arbitration, "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Whether parties agreed to arbitrate is determined by state law. *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002). New York law governs this dispute.

The party moving to compel arbitration bears the initial burden of showing that an arbitration agreement exists by a preponderance of the credible evidence. *Fleming v. J. Crew*, No. 16-cv-2663 (GHW), 2016 WL 6208570, at *3 (S.D.N.Y. Oct. 21, 2016) (citing *Couch v. AT&T Servs., Inc.*, No. 13-cv-2004 (DRH) (GRB), 2014 WL 7424093, at *3 (E.D.N.Y. Dec. 31, 2014)); *see Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995). "A preponderance of the evidence means such evidence which, when considered and compared with that opposed to it, produces a belief that what is sought to be proved is more likely true than not." *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-4570 (LAK) (KHP), 2017 WL 7309893, at *2 (S.D.N.Y. Nov. 20, 2017) (citation omitted), *adopted by*, No. 17-CV-4570 (LAK), 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018), *aff'd*, 763 F. App'x 101 (2d Cir. 2019).

If the movant meets this prima facie showing, the burden shifts to the non-movant to show that: (i) it did not consent to arbitration, (ii) the arbitration agreement is invalid or unenforceable, or (iii) the arbitration agreement does not encompass the claims the movant wishes to arbitrate. *See Porcelli v. JetSmarter, Inc.*, No. 19-CV-2537 (PAE), 2019 WL 2371896, at *3 (S.D.N.Y. June 5, 2019) (citations omitted); *Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342-43 (S.D.N.Y. 2014), (citing *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90-92 (2000), *aff'd*, 633 F. App'x 544 (2d Cir. 2015).

When deciding a motion to compel arbitration and stay all or part of a litigation pursuant to the FAA, the court applies a "standard similar to that applicable for a motion for summary judgment." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (*quoting Nicosia v. Amazon.com, Inc.,* 834 F.3d 220, 229 (2d Cir. 2016)). Under this standard, the court considers all relevant, admissible evidence contained in the pleadings, admissions on file, and affidavits. *Id.* (citations omitted). In the absence of a genuine issue of material fact regarding the formation of the arbitration agreement, the motion to compel and to stay the litigation (in whole or in part) must be granted if the dispute falls within the scope of the arbitration agreement.[5] *Id.*; *see also Meyer*, 868 F.3d at 76 ("[O]n a motion to compel arbitration, we may determine that an agreement to arbitrate exists where the notice of the arbitration provision was reasonably conspicuous and manifestation of assent unambiguous as a matter of law.").

   2. *Application*

      i. *Mr. Daramola is Bound by the Valid Arbitration Agreement in Uber's December 2021 Terms of Use.*

No genuine issue of material fact exists regarding whether Mr. Daramola, who called the Uber for Mr. Hamilton on July 26, 2022, entered into a valid and binding arbitration agreement with Uber. According to Uber's records, Mr. Daramola created his Uber Rider account on April 4, 2016, and expressly agreed to Uber's December 2021 Terms of Use on April 1, 2022, by checking an "I agree" box next to the statement: "By checking the box, I have reviewed and agreed to the Terms of Use and acknowledge the Privacy Policy[,]" and then clicking "Confirm."

---

[5] Separate and apart from the issue of the formation of an arbitration agreement, the Court accepts as true the factual allegations in the complaint that relate to the underlying dispute between the parties for purposes of a motion to compel. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012).

(ECF 27-10, Ex. F; *see supra* nn.2-3). Courts in this circuit have held that this form of notice and consent suffices to bind individuals to hyperlinked terms and conditions. *See, e.g.*, *Meyer*, 868 F.3d at 75, 80 (holding that Plaintiff Uber user had "unambiguously manifested his assent to Uber's Terms of Service" and explaining that "Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'"). These Terms of Use contain a valid arbitration agreement that states that "[b]y agreeing to the Terms, you agree that you are required to resolve any claim that you may have against Uber on an individual basis in arbitration as set forth in this Arbitration Agreement . . . ." (ECF 27-11, Ex. G at Section 2). This Agreement requires arbitration of not only Mr. Daramola's own claims but "any claims brought by or against any third parties, including . . . third-party beneficiaries . . . where their underlying claims arise out of or relate to your use of the Services." (*Id.* at Section 2(a)(5)).

Accordingly, Mr. Daramola entered into a valid agreement with Uber that explicitly binds third-party beneficiaries to arbitrate their claims with Uber.

> ii. Mr. Hamilton is bound by Mr. Daramola's Arbitration Agreement as a Third-Party Beneficiary.

Under the plain language of the Arbitration Agreement in the December 2021 Terms of Use, Mr. Hamilton's claims both "arise out of" and "relate to" Mr. Daramola's use of his Uber Rider App. Mr. Daramola used the Uber App on his phone to provide Mr. Hamilton with transportation to his dialysis appointment, something he had done on other occasions. (ECF 21 at 2, "Plaintiff has been using [Uber's] services . . . hundreds of times as a "guest rider" to his dialysis appointments."). Mr. Hamilton asserts, however, that he did not know about or agree to Uber's terms, and that it is unconstitutional to bind people without their knowledge and

understanding of the consequences of a binding arbitration agreement. He argues that "this portion of the Defendant's policy as it relates to third party claims is unconstitutional, and the arbitration agreement is not enforceable in this particular case." (ECF 21 at 4). He emphasizes that he "did not notice the terms and conditions either while registering to use Uber himself or especially while using Uber's transportation service as a 'third party user'" of Mr. Daramola's Uber Rider account. (ECF 30 at 8). Mr. Hamilton further argues that regardless, he "would still be a non-signatory" to Mr. Daramola's Arbitration Agreement and as such cannot be bound by it. (ECF 21 at 2). Contrary to Mr. Hamilton's assertions, a non-signatory may be bound to an arbitration agreement "if so dictated by the ordinary principles of contract and agency." *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (internal quotation marks omitted).

The five "traditional" theories for binding non-signatories to arbitration agreements are: 1) incorporation by reference, 2) assumption, 3) agency, 4) veil-piercing or alter ego, and 5) estoppel. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (recognizing "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel'") (citation omitted). "A third party is a beneficiary of an agreement when 'recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.'" *City of Almaty, Kazakhstan v. Sater*, No. 19-CV-2645 (AJN) (KHP), 2019 WL 6681560, at *11 (S.D.N.Y. Dec. 6, 2019), *objections overruled sub nom. City of Almaty v. Sater*, No. 19-CV-2645 (AJN), 2021

WL 4940304 (S.D.N.Y. Oct. 22, 2021) (quoting *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 52 (2d Cir. 2012)).

In this case, Mr. Hamilton benefited from Mr. Daramola's agreement with Uber, particularly after he could not use his own Uber account following its permanent suspension in October 2021. Further, it is clear from Mr. Hamilton's second memorandum in opposition that he understood himself to be a third-party beneficiary of this agreement. (*See* ECF 21 at 4). Mr. Hamilton acknowledges that as a "guest rider," he "was a third party beneficiary of the Defendant's transportation services where [his] underlying claims arose out of the use of such services on July 26, 2022." (*Id.*) This is not a case where Mr. Hamilton had no prior knowledge of Uber and its services. While Mr. Hamilton is bound by Mr. Daramola's contractual agreement with Uber, Mr. Hamilton previously entered into his own agreement with Uber. (*See* ECF 21 at 2). Mr. Hamilton registered for and used his *own* Uber Rider App until it was suspended. (*Id.*) After he could no longer use his own account, he continued to use Uber's services through Mr. Daramola, who he referred to in his conversation with Uber's customer service following the incident, as his "car service provider," indicating that both he and Mr. Daramola intended for Mr. Hamilton to use and benefit from Mr. Daramola's Uber Rider App. (ECF 27-8, Ex. D). While the Court sympathizes with Mr. Hamilton,[6] binding "clickwrap" arbitration agreements are not only constitutional, but a ubiquitous feature of the internet age, and Mr. Hamilton is bound by

---

[6] As Mr. Hamilton astutely presses, "[m]ost of the users who register for the Defendant's services via the Uber mobile applications do not read the terms of use included with the application." (ECF 22 at 2). *See also Chilutti v. Uber Techs., Inc.*, 2022 Pa. Super. 172, 2022 WL 6886984, at *17-18 (Pa. Super. Ct. July 19, 2023) ("[I]t must be noted that the evolution and effect of arbitration provisions has substantially weakened the constitutional right to a jury trial in civil proceedings. . . . The sluggish recognition regarding the copious usage of arbitration agreements in present day contracts and the ramifications of these agreements on a party's right to a jury trial raises concern, especially in the context of Internet contracts — like the one at issue herein — where the parties are of purported unequal bargaining power.").

its terms when he used Uber's smartphone app to procure transportation services, even where those terms are hyperlinked, lengthy, and difficult to read let alone understand, and even if individuals like Mr. Hamilton did not, in fact, read and understand them. *See, e.g.*, *Meyer*, 868 F.3d at 80 ("The registration process clearly contemplated some sort of continuing relationship between the putative user and Uber, one that would require some terms and conditions . . . .").

Mr. Hamilton does not dispute that his claims would be covered by the Arbitration Agreement. To the extent, however, that Mr. Hamilton, who is *pro se*, would assert such an argument, it would not find traction. The December 2021 Terms of Use broadly cover the following claims, which include those Mr. Hamilton asserts in his complaint:

> [Y]ou and Uber agree that any dispute, claim or controversy in any way arising out of or relating to (i) these Terms and prior versions of these Terms, or the existence, breach, termination, enforcement, interpretation, scope, waiver, or validity thereof; (ii) your access to or use of the Services at any time; (iii) incidents or accidents resulting in personal injury to you or anyone else that you allege occurred in connection with your use of the Services . . . , regardless whether the dispute, claim or controversy occurred or accrued before or after the date you agreed to the Terms, and regardless whether you allege that the personal injury was experienced by you or anyone else; and (iv) your relationship with Uber, will be settled by binding individual arbitration between you and Uber, and not in a court of law. This Arbitration Agreement survives after your relationship with Uber ends.

(ECF 27-11, Ex. G at Section 2(a)(1)).

Accordingly, the Court finds that Mr. Hamilton is a third-party beneficiary of Mr. Daramola's contractual agreement with Uber, and as such is bound to arbitrate his claims pursuant to the December 2021 Terms of Use.

### IV. CONCLUSION

For the foregoing reasons, Uber's motion to compel Mr. Hamilton's claims to arbitration is **GRANTED**. This case is hereby **STAYED in its entirety pending the outcome of arbitration**.

**SO ORDERED.**

Dated: September 7, 2023                                           *s/ Ona T. Wang*
       New York, New York                                   **Ona T. Wang**
                                                              United States Magistrate Judge